# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 11-575 |
| JEFFREY LYNN FORBES | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SPECIAL PROBATION PURSUANT TO TITLE 18, UNITED STATES CODE, SECTION 3607**

The defendant, Jeffrey Lynn Forbes, comes before the Court seeking "Special Probation" despite the crimes he has committed while at work manufacturing military helicopters for The Boeing Company, which he, perhaps more than anyone in light of his military history, should know are used in sensitive military operations all over the world. Furthermore, in his sentencing memorandum, he lies to the Court about his illegal conduct: September 9th was not the first time he purchased illegal prescription medications at The Boeing Company's Ridley Park plant. Rather, if the defendant were truthful to the Court, he would admit that he would purchase from the government cooperator whenever his prescription would run out, which translated into at least once a week for more than two years. A defendant that cannot come before this Court and be truthful about his own illegal actions should not receive the unique benefit of Special Probation, which would render any background check by a future employer useless for learning that this individual was part of the outrageous and extremely dangerous drug culture at the Boeing plant.

In consideration of the defendant's lack of criminal history and medical-related addiction issues, the government respectfully requests that the Court fashion a sentence under the guidelines that affords him an opportunity to address those issues and become a law-abiding

citizen. Accordingly, the government respectfully requests that the Court deny the defendant's 3607 motion and sentence the defendant to a guideline sentence.

I.  **BACKGROUND**

On July 29, 2012, the defendant pled guilty to Counts One through Three of the information charging him with attempted possession of oxycodone and fentanyl, in violation of Title 21, United States Code, Section 846. The charges stem from his attempts on September 9th, 23rd, and 26th, 2011, to illegally purchase Oxycontin tablets and Actiq lollipops from an individual cooperating with the government on The Boeing Company's Ridley Park campus.

II.  **SENTENCING CALCULATION**

    A.  **Statutory Maximum Sentence**

According to the Probation Office, the Court may impose a sentence of one year imprisonment, a year of supervised release, a $100,000 fine, and a $25 special assessment.[1]

    B.  **Sentencing Guidelines Calculation**

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base offense level based on attempted possession of controlled substances, 21 U.S.C. § 844, under U.S.S.G. § 2D2.1: | 8 |
| Adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a) | - 2 |
| **TOTAL OFFENSE LEVEL** | **6** |

The defendant has a Criminal History Category of I because he has no prior convictions. PSR ¶ 30. Accordingly, with a total offense level of 6 and a criminal history category of I, his

---

[1] The potential fine of $300,000 is different from the fine that the parties understood could be imposed at the time of the defendant's change of plea hearing – it was the parties understanding that the maximum fine that could be imposed was $3,000 per count of conviction. The special assessment is also different in that it is $75 instead of $300.

guidelines range is **zero to six months imprisonment**. Pursuant to Title 18, United States Code, Section 3561(c)(2), the defendant is eligible for up to five years of probation, and the guidelines provide that the Court may require as a condition of probation up to six months of intermittent confinement, community confinement, or home detention. PSR ¶¶ 59-60.

III.     DISCUSSION OF THE SENTENCING FACTORS

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[2] In this case, the government believes that special probation is not warranted and that

---

[2] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

the Court should sentence the defendant to a guideline sentence that takes into consideration his drug addiction and medical issues.

    **A.**     **Nature and Circumstances of the Offense and History and Characteristics of the Defendant.**

    **I.**     **Oxycodone**

"Oxycodone is a semisynthetic opiate manufactured by modifying the chemical thebaine, an organic chemical found in opium.[3] It is the active ingredient in a number of commonly prescribed pain relief medications, including Percocet and OxyContin, that come in a variety of dose strengths.[4] The "[i]ntended use of OxyContin is for long-term relief (up to 12 hours) of moderate to severe pain associated with conditions such as cancer and arthritis."[5] Currently all of the products containing oxycodone are classified by the Drug Enforcement Administration as Schedule II controlled substances.[6]

Oxycodone's chemical structure is similar to codeine and is almost a potent as morphine in its ability to produce opiate-like effects, including euphoria.[7] It works through the central nervous system by altering the user's sense of pain and his or her emotional response to pain, but like other narcotic medications, can impair certain daily activities, including driving and other mental and physical abilities.[8] These side effects – including breathing irregularity or respiratory depression; increased pressure of cerebral and spinal fluid; headaches; nausea;

---

[3] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

[4] Id.

[5] Id.

[6] Id.

[7] Id.; http://www.teenoverthecounter drugabuse.com/oxycodone.html.

[8] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

4

dizziness; seizures; heart failure; and low blood pressure -- are usually mild, but there are more serious complications and negative effects from using products containing oxycodone, particularly when abused.[9]

When oxycodone products are used consistent with a doctor's care, signs of addiction can be monitored and controlled more effectively than when used outside of a doctor's care.[10] Accordingly, "when used illicitly, the chances of becoming addicted to it increase exponentially."[11] In part, this is caused by the fact that oxycodone has "many similarities to other drugs of abuse including alcohol, heroin, and marijuana, in that they elevate levels of dopamine, the neurotransmitter linked with pleasure experiences. As a result, prolonged use and abuse of oxycodone medications eventually changes the brain in such a way that a user cannot quit on his or her own, a typical sign of addiction."[12] "Drugs that cause similar effects to oxycodone include: opium, codeine, heroin, methadone, hydrocodone, fentanyl, and morphine."[13] The potential for withdrawal symptoms when using prescription opioids (e.g., oxycodone) is extremely high, especially when the user stops suddenly, and may include severe symptoms such as anxiety, nausea, insomnia, muscle pain, fevers, and other flu like symptoms.[14]

---

[9] Id.

[10] Id.

[11] Id.

[12] Id.

[13] http://www.justice.gov/dea/pubs/abuse/drug_data_sheets/Oxycodone.pdf

[14] Id.

## II. Fentanyl

"Fentanyl is 100 times more potent than morphine as an analgesic," and is extensively used for anesthesia and analgesia but is also used for chronic pain management.[15] Actiq, the type of fentanyl product at issue here, is a "solid formulation of fentanyl citrate on a stick that dissolves slowly in the mouth for transmucosal absorption.[16] "It is intended for opiate-tolerant individuals and is effective in treating breakthrough pain in cancer patients."[17]

"[Fentanyl] is similar to other opioids like morphine or oxycodone in its pharmacological effects and produces analgesia, sedation, respiratory depression, nausea, and vomiting.[18] It also appears to produce muscle rigidity with greater frequency than other opioids.[19] The biological effects are indistinguishable from those of heroin, with the exception that fentanyls may be hundreds of times more potent."[20]

Like oxycodone, fentanyl is classified as a schedule II substance and is abused for its intense euphoric effects.[21] "Fentanyl can serve as a direct substitute for heroin in opioid dependent individuals," but is a very dangerous substitute for heroin because it is much more potent than heroin and results in frequent overdoses that can lead to respiratory depression and death."[22]

---

[15] http://www.deadiversion.usdoj.gov/drugs_concern/fentanyl.pdf; http://www.justice.gov/dea/concern/fentanyl.html

[16] http://www.justice.gov/dea/concern/fentanyl.html

[17] Id.

[18] Id.

[19] Id.

[20] Id.

[21] http://www.justice.gov/dea/concern/fentanyl.html

[22] Id.

### III. Prescription Drug Abuse is a Rampant National and Local Problem

Prescription drug abuse – despite (or maybe because of) popular misconceptions – is more wide-spread, more destructive, and more dangerous than even street-level drug abuse. Nearly seven million Americans are hooked on prescription drugs, more than are addicted to cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[23] Prescription drugs hook the poor and the rich, the old and the young, the black and the white.[24] It is an epidemic.[25] Just like street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of crack.[26] And just like street drugs, prescription drug abuse produces the same problems: "addiction, crime and broken families."[27]

In recent years, courts around the country have begun to recognize the same. See, e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller. While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime

---

[23] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.html.

[24] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who supplied her with the drugs lost his license).

[25] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[26] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/2006/HEALTH/05/16/cnna.passierb/index.html.

[27] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times, March 18, 2004, at A24.

7

still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold misery and harm. The White House drug policy office estimates that such abuse rose seventeen percent from 2001 to 2005. That office reports that currently there are more new abusers of prescription drugs than new users of any illicit drugs. As recently reported, "Young people mistakenly believe prescription drugs are safer than street drugs . . . but accidental prescription drug deaths are rising and students who abuse pills are more likely to drive fast, binge-drink and engage in other dangerous behaviors."

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL 398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of prescription drug abuse").

In the Eastern District of Pennsylvania, prescription drug abuse is quite significant as well.[28] Local clinics have stated that "drug addiction in both Philadelphia and New Jersey is almost legendary due to its severity. Heroin and opioid-based prescription medication are two the top drugs abused in these areas. More than four percent of those surveyed in both the Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug dealers."[29] State legislators in Pennsylvania have been trying to address this growing problem.[30]

---

[28] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area Drug Market Analysis, June 2007, available at http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[29] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[30] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican Communications, May 3, 2004, available at http://www.pasenategop.com/news/archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud and abuse are becoming a serious problem in Pennsylvania and other states, and stricter guidelines need to be in place to combat the problem. He said prescription drug abuse accounts for approximately one-third of all drug abuse in the United States.").

Part of the reason that prescription drug abuse is so rampant is because they come with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them. There is very low social disapproval.[31] The general public – which the Court takes into consideration at the time of sentencing when considering the nature of the defendant's conduct – is grossly misinformed about the danger of prescription drug abuse. According to a recent poll:

- 40 percent say prescription pills are "much safer" than illegal drugs.
- 31 percent say there is "nothing wrong" with prescription drug use.
- 29 percent think prescription painkillers are non-addictive.[32]

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[33] This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[34]

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[35] It is a "significant threat" in the United States.[36]

---

[31] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available at http://features.us.reuters.com/wellbeing/news/S3020463.html.

[32] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/2006/HEALTH/05/16/cnna.passierb/index.html.

[33] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[34] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

[35] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[36] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[37] The investigation here took four years and a large amount of resources – the federal government simply does not have the resources to investigate every individual user at The Boeing Company's Ridley Park facility or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

### IV. Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society

The defendant in this and the 36 other cases arising out of the purchase and sale of prescription drugs at The Boeing Company's Ridley Park facility is a skilled worker whose employment at The Boeing Company provided him with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[38] Here, the defendants salary for the five years leading up to his arrest was more than $150,000, which is not only an extraordinary amount of money, but which puts him in the top 10% of all American earners. And unlike junkies and drug dealers on the street, the defendant had options. The Boeing Company's medical coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment. As government witnesses explained to the Court, anyone working at Boeing could get drug treatment offered by the medical plan at no cost to the employee, without a manager even being notified that the employee had a drug problem, and while receiving disability benefits in lieu of salary. Further,

---

[37] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

[38] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

if an employee was in the process of being disciplined for work-related infractions and that employee notified Boeing management that the genesis of their problems was drug addiction, Boeing would offer them treatment that, if successful, would allow them to retain their employment.

What must be considered in determining the appropriate sentence for this defendant is not just the salary, medical benefits and treatment options that the defendant was offered by virtue of his employment, but also the extremely sensitive nature of his work – work he performed while using and abusing opioids.

The Boeing Company Ridley Park facility produces the CH-47 Chinook and portions of the V-22 Osprey. "The Chinook is a multi-mission, heavy-lift transport helicopter. Its primary mission is to move troops, artillery, ammunition, fuel, water, barrier materials, supplies and equipment on the battlefield. Its secondary missions include medical evacuation, disaster relief, search and rescue, aircraft recovery, fire fighting, parachute drops, heavy construction and civil development."[39] Chinooks are currently in use by the U.S. Army, U.S. Army Reserve and National Guard, and International armed forces.[40] It has had wide use in Operation Enduring Freedom in Afghanistan and Operation Iraqi Freedom in Iraq, including use in air assault missions, inserting troops into fire bases and later bringing food, water, and ammunition.[41] It was particularly useful in the mountainous terrain of Afghanistan where high altitudes and temperatures limited the use of the Black Hawk.[42]

---

[39] http://www.boeing.com/rotorcraft/military/ch47d/.

[40] http://www.boeing.com/rotorcraft/military/ch47d/docs/CH-47D_overview.pdf

[41] http://www.armedforces-int.com/projects/boeing_ch_47_chinook.html

[42] Id.

11

The V-22 Osprey is the first aircraft designed from the ground up to meet the needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops, 20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard an aircraft carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-to-air refueling capability, the cornerstone of the ability to self-deploy."[43] As a result, "more than 165 Osprey tiltrotors are currently in operation across 10 Marine Corps and two Air Force Special Operations Command Osprey squadrons. The two services have together logged 16 successful combat, humanitarian, ship-based or Special Operations deployments since 2007. The worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those hours logged in the past two years."[44]

The government understands that the defendant held a particularly skilled position on the manufacture of the V-22 and/or Osprey at Boeing in that he was a Materials, Process & Physics (MP&P) Technical Analyst, which is a senior, non-union position that requires, *inter alia*, "complex analysis and or evaluation of parts, materials, processes, technology or equipment through research and testing to ensure safety, reliability and adherence to requirements and specifications[,and leadership], coordinat[tion] and conduct[ing of] complex analysis of failed parts and processes to reduce or eliminate future failures." Found at http://www.aftercollege.com/company/the-boeing-company/101994/32805998/. Therefore the consequences of any undetected errors made by this defendant during his work cannot be

---

[43] http://www.boeing.com/rotorcraft/military/v22/

[44] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

understated. Any errors that affected the performance of completed Chinook or V-22 Osprey could prove disastrous, as experience has shown. For example, in May 2011, the Australian Army grounded its fleet of Chinook helicopters after one of the large troop-carrying aircraft crashed in Afghanistan, killing an army pilot.[45] There is no indication that the cause of the crash had anything to do with substance abuse by employees at Boeing's Ridley Park facility, but the story is illustrative of the exponential effect that a problem with a single Chinook or V-22 Osprey could have on military operations: possible injury or death to the crew using the particular aircraft plus complete grounding of the entire fleet. In fact, the United States military has also grounded its Chinook and V-22 Osprey fleets when accidents have happened. For example, the United States Army grounded its 466 Chinook' troop helicopters in August 1999 and advised other militaries to halt flights worldwide after a crack was found in an engine gear of a British Chinook helicopter; the United States Marine Corps grounded its fleet of V-22 Osprey in February 2007 after discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[46]

## V. Analysis of the Defendant's Background

The defendant began his employment at Boeing in 1986 and, since 2000, has been a Technical Analyst. By performing his job while illegally purchasing and using prescription medication, he betrayed the men and women who depended on him to make sure that the helicopters they are flying in are the highest quality machinery our nation can offer them.

---

[45] http://www.theaustralian.com.au/national-affairs/defence/chinook-fleet-grounded-as-fatal-afghan-crash-investigated/story-e6frg8yo-1226159681671. The cause of the crash may never be known because the flight recorders were destroyed by a missile soon after the accident. http://www.dailytelegraph.com.au/news/cause-of-a-helicopter-crash-in-afghanistan-that-killed-army-pilot-lieutenant-marcus-case-may-never-be-known/story-e6freuy9-1226397995791

[46] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

For these reasons, the government respectfully requests that the Court deny the defendant's motion for Section 3607 relief and sentence the defendant to an appropriate sentence under the guidelines.

B.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, and reflect the seriousness of the offense. For the defendant to come before this Court and state that he never illegally purchased prescription medications at Boeing until the reverse-operation of the government is not only an outrageous fabrication, but does reflect an acknowledgment of the seriousness of his offenses. The government respectfully submits that to give this defendant Section 3607 relief also would undercut respect for the law by those with whom he worked, and would not provide a just punishment for his offenses.

C.  **The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

When passing the Sentencing Reform Act, Congress explained:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

Prescription drug abuse is a "significant threat" in the United States.[47] The investigation here took a large amount of government resources and, because of the nature of the plant under investigation and the closed culture of its employees, took many years. Accordingly, a guideline sentence is necessary to afford both specific and general deterrence to criminal conduct. The government requests that the Court use its discretion to deny the defendant Section 3607 relief and sentence the defendant to a guideline sentence that would assist him with his addiction issues.

> D. **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

In this case, in light of the defendant's need for substance abuse treatment, the government requests that the Court to adjust the defendant's sentence "to provide the defendant with needed medical care, or other correctional treatment in the most effective manner . . ." Section 3553(a)(2)(D).

> E. **The Guidelines and Policy Statements Issued by the Sentencing Commission**

As stated earlier, the Guidelines retain their significant importance in advising judges about appropriate sentences. Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. The only vehicle for achieving such a goal is through the application of the Sentencing Guidelines. Here, the defendant abused his position as a worker at the Boeing plant and put the lives of the men and women serving the United States and other militaries around the world at risk. His conduct warrants a guideline sentence.

---

[47] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

### F. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

A guidelines sentence is necessary when considering the importance of avoiding unwarranted sentencing disparities, another factor that is set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").

### G. The Need to Provide Restitution to Any Victims of the Offense

Restitution is not an issue in this case.

## IV. CONCLUSION

For all of the reasons stated above, the government respectfully recommends that the Court deny the defendant's motion for Section 3607 relief and sentence the defendant to a guideline sentence that affords the defendant drug treatment opportunities.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


_____/s/_____
FAITHE MOORE TAYLOR
ASHLEY K. LUNKENHEIMER
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that a copy of the GOVERNMENT'S SENTENCING MEMORANDUM has been filed electronically on the Electronic Case Filing system and is available for viewing and downloading from the ECF system, and/or was served by electronic mail on the following defense counsel:

Steven F. O'Meara, Esq.
Counsel for Jeffrey Lynn Forbes

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date: November 3, 2012